56 CCPA

### Application of Robert G. WOOLERY.
### Patent Appeal No. 8020.

United States Court of Customs
and Patent Appeals.
Jan. 16, 1969.

Lawrence G. Kastriner, New York City
(Paul A. Rose, Washington, D. C., of
counsel) for appellant.

Joseph Schimmel, Washington, D. C.
(Joseph F. Nakamura, Washington, D. C.
of counsel) for the Commissioner of
Patents.

Before WORLEY, Chief Judge, and
RICH, SMITH, ALMOND, and BALD-
WIN, Judges.

RICH, Judge.

This appeal is from the decision of the
Patent Office Board of Appeals affirm-
ing the rejection of claims 1–18 of ap-
plication serial No. 432,382, filed Feb-
ruary 12, 1965, entitled "Cellulosic Paper
Containing Asbestos." No claim has
been allowed.

The invention relates to the manu-
facture of paper comprising primarily
cellulosic fiber and using in addition a
material which appellant refers to as
"high purity" asbestos and defines as
"chrysotile asbestos characterized by a
specific surface area greater than 60
$m^2$/gm., a magnetite content less than
0.5 per cent, a reflectance greater than
72 per cent and a pulpability such that
less than 1.0% of the asbestos is retained
on a 65 mesh Tyler screen." As dis-
cussed in more detail below, use of this
"high purity" asbestos in the manufac-
ture of cellulosic paper, as compared to
the use of "prior art" asbestos or no
asbestos at all, is said to result in a
number of improvements in the quality
of the paper and in the manufacturing
process.

Claim 1 is representative of the claims
on appeal:

1. A paper furnish composition
suitable for the preparation of non-
woven paper sheets comprising:

(a) an aqueous dispersion of cel-
lulosic paper-making fibers, and

(b) from about 0.5 to 30 per cent
by weight, based on the weight of
the cellulosic fibers, of high purity
chrysotile asbestos characterized by a
specific surface area greater than 60
$m^2$/gm., a magnetite content less than
0.5 per cent, a reflectance greater than
72 per cent, and a pulpability such that
less than 1.0 per cent of the asbestos
is retained on a 65 mesh Tyler screen.

Claims 6 and 14 are also independent
claims drawn, respectively, to a process
of manufacturing paper using the com-
position of claim 1 and a paper sheet
obtained by this process. Claims 2–5,
7–10, and 15–18 are ultimately dependent
on claims 1, 6, and 14, respectively, and
recite "sizing," a "rubbery latex binder,"
or a "non-fibrous inorganic filler" as
additional paper-making ingredients.
Claims 11 and 12 are independent claims
drawn to two preferred embodiments of
the process wherein a pre-mixed, "high-
purity" asbestos composition containing
a dye (claim 11) or containing a non-
fibrous inorganic filler (claim 12) is
added to an otherwise conventional paper
furnish composition prior to depositing

the furnish on a paper-making screen. Claim 13 is dependent on claim 12 and recites a specific filler, titanium dioxide.

The only issue we find it necessary to consider is whether or not the claimed invention is obvious within the meaning of 35 U.S.C. § 103 in view of prior art and therefore unpatentable. Four United States patents were relied on by the examiner:

Greenman et al. 2,698,788 Jan. 4, 1955
Schur et al. 2,733,720 Feb. 7, 1956
Poelman et al. 3,034,981 May 15, 1962
Novak 3,062,701 Nov. 6, 1962

The examiner rejected all claims on Novak *alone,* certain claims were *alternatively* rejected on Schur *alone,* and several claims were further rejected on Novak in view of Poelman or Greenman. We need not discuss Schur because Novak is clearly the more relevant of the two primary references. Since Poelman and Greenman were cited solely to show the use of latex with asbestos fiber compositions, and since appellant, in his application and in his brief, admits that this use of latex was known in the art, it is also unnecessary for us to discuss these two references or the rejections based on their combination with Novak.

The only remaining reference, Novak, discloses a method of opening the tight fiber bundles of milled chrysotile asbestos into unit fibers and discloses the use of these fibers as an additive in cellulosic paper. The milled asbestos is opened by agitation in water containing a controlled amount of a surface active agent. There is obtained a dispersion of unit fibers which, upon standing, reverts to a "minimal clotted" state. Novak states that "Such minimal clotted asbestos fiber

body may then be readily diluted to any desired degree in the paper-making process and added at a point in the beater where the paper-making adjuvants, such as alum, sizing, and the like are introduced." Novak asserts that this method of obtaining unit asbestos fibers is preferred to grinding and beating milled asbestos to very small bits, lengthwise and in diameter, because it provides longer fibers of more uniform diameter.

The examiner observed that Novak shows the combination of cellulosic fibers and unit asbestos fibers and took the position that it would be obvious to one skilled in the art to substitute other unit asbestos fibers for those used by Novak. The board affirmed the decision of the examiner stating, inter alia:

> Since * * * Novak * * * disclose[s] the use of asbestos fibers in papermaking, it would have been obvious to a person of ordinary skill in this art to employ a subsequently discovered or developed improved form of asbestos fibers for the same purpose with the expectation of obtaining improved results.

With reference to a Rule 132 affidavit filed by appellant, the board said:

> * * * it appears that the advantages urged are those which would be expected to flow from the substitution of a "high purity" asbestos for any of those previously employed.

Appellant acknowledges "that asbestos has long been used as an additive to cellulosic paper * * *."[1] However, he says that attempts to use "prior art asbestos"[2] in the better grades of paper, such as white writing paper, have presented a number of problems such as lumping, coarseness, black specks, and

1. The following definition appears in appellant's application:
   The term "paper" is used throughout the specification and claims of this disclosure in its generic sense to include any *non-woven, felted fibrous sheet,* including but not restricted to bond, wrapping, tissue, printing, wall and backing paper, as well as cardboard, wallboard, millboard, and the like.

2. This expression, as used by appellant and as used herein, refers to "commercially available" asbestos such as that compared with appellant's "high purity" asbestos in Table I, infra, and does not include asbestos obtained by the Novak process.

gray coloration. The lumping and coarseness, appellant says, are caused by "flakes and bundles of unrefined or unopened asbestos fibers" which "not only give the paper an unsightly appearance, but * * * [give] it a rough uneven surface which causes uneven dye and ink receptivity." This lumping and coarseness is said to prevent the use of prior art asbestos even in brown wrapping paper. With respect to the problems of black specks and gray coloration, resulting from the use of "prior art asbestos," appellant's specification states:

> Prior art asbestos has not been used successfully in the manufacture of white paper, for several reasons, among them being its low (below 70%) reflectance level. * * *
> * * * It is to a great extent the presence of magnetite particles that renders prior art asbestos grey rather than white, which is the color of highly purified asbestos. Magnetite occurs in most chrysotile asbestos deposits as a hard black crystalline material. Its presence is highly detrimental in a paper furnish, since it causes black specks to appear in the paper, lowers its reflectance, and due to its abrasiveness causes excessive wear on papermaking screens and printing plates.[3]

Appellant has discovered that all these problems can be avoided by utilizing an asbestos having a higher reflectance, lower magnetite content, higher specific surface area, and lower pulpability than the "prior art" asbestos; the magnitude of the differences between "high purity" asbestos and "[two] types of the closest *commercially available* * * * chrysotile asbestos" (emphasis added) is shown in Table I, infra, from appellant's specification.

Table I

COMPARATIVE PHYSICAL PROPERTIES OF ASBESTOS FIBERS

| Type of Asbestos | Per Cent Reflectance | Per Cent Magnetite | Specific Surface Area, $m^2$/gm. | Pulpability % +65 mesh |
|---|---|---|---|---|
| Canadian Chrysotile | 55–70 | 3.5–4.8 | 19–31 | 10–20 |
| Conventional Coalinga Chrysotile | 60–64 | 1.0–3.0 | 55–59 | 10–67 |
| High Purity Coalinga Chrysotile | 72–78 | 0.04–0.5 | 60–80 | 0.25–1.0 |

The higher purity (higher reflectance and lower magnetite content[4]) of "high purity" asbestos eliminates the problems of grayness and black specks; the small-

3. It is pertinent to point out that appellant does not assert that the art failed to recognize these causes of lumping, coarseness, black specks, and grayness.

4. Appellant's brief states:
   Perhaps the Board was misled by the term "high purity" asbestos and assumed from this convenient lable [sic] that appellant's asbestos product was simply more pure than "prior art" asbestos. Reference to the specific, critical and unique characteristics or limitations will show that only one of the four limitations is related to purity, namely *magnatite* [sic] *content.* The other three limitations, surface area,

er particle size (higher specific surface area) eliminates coarseness; and the low incidence of unopened fiber bundles (low pulpability) eliminates lumping. Also, examples in appellant's specification demonstrate that, compared to the use of *no asbestos* in the manufacture of paper, "high purity" asbestos improves retention of cellulosic fibers, fillers, and latex as water is eliminated from the paper furnish composition; the asbestos is said to "act like a filter" which catches the other ingredients and is also said to *attract* inorganic fillers such as titanium dioxide.

Appellant acknowledges that patentability of all of the appealed claims rests only on one ground, the use of "high purity" asbestos. The issue of nonobviousness may therefore be reduced to the following: would one of ordinary skill in the art, at the time appellant's invention was made, have considered it obvious to use an asbestos having the characteristics of "high purity" asbestos in the manufacture of cellulosic paper with the expectation of obtaining improved results which appellant has shown to be possible. In view of the specific teachings of Novak referred to below, we are convinced that he would.

Regarding the desirability of using an asbestos which has a high surface area and is free of unopened fiber bundles, Novak says:

> Surface area determinations have indicated that the area of a given weight of my unit asbestos fibers is at least five times that of milled asbestos fiber. Since the increase in the number of fibers is at least five times the increase in surface area as a bundle of fibers is opened to its unit fibers, there must be at least 25 times as many fibers in a given weight of my fibers as in milled fiber. This is responsible for the much greater smoothness, softness, and uniformity

of asbestos papers made from these opened fibers. This also accounts for the much greater efficiency of these fibers in separating cellulose fibers from each other when used with cellulose fibers in cellulose paper making.

The softness and inertness of asbestos fiber has been desired as a modifier of the relatively harsher cellulose fibers, but combinations have been unsatisfactory because of the *same coarseness and ununiform fiber character* that exists in commercial asbestos paper. Bits of *unopened asbestos fiber* that might be tolerated in the latter, *would be fatal to the expected uniformity of cellulose papers.* * * * my opened fiber in slurry form is as smooth and uniform as a well-made cellulose paper making slurry, and can therefore be used therewith in any desired proportion to provide its characteristic properties to the composite of fibers. [Emphasis added.]

Regarding "cleanliness and fineness," Novak also teaches that "undesirable oversize or foreign particle material content" should be removed from the unit asbestos fibers by "screening, straining, centrifuging, etc.," the colloidal suspension. Novak further discloses that unit asbestos fibers aid in the retention of "powdered materials such as pigments, fillers, resins or other modifying agents" because of entanglement of the latter in the former, and further discloses that titanium dioxide particles are strongly *attracted* to unit asbestos fibers when the two materials are in a dispersion.

Comparing the differences between appellant's "high purity" asbestos and the "prior art" asbestos (other than Novak's, note 2 supra) we thus find the desirability of each difference taught in Novak, namely, low foreign material particle content (high reflectance and low magnetite content), high surface area,

reflectance, and pulpability have no direct relationship to purity. [Emphasis quoted.]

Appellant's specification, however, belies these assertions, viz.:

The significantly greater *purity* of the asbestos essential in this invention is demonstrated by its improved reflectance *and* magnetite content. [Emphasis added.]

and relative absence of unopened fiber bundles (low pulpability). We also find teachings that unit asbestos fibers aid in the retention of other paper making ingredients by way of entanglement and even find a teaching that unit asbestos fibers attract titanium dioxide particles.

Appellant maintains that Novak does not render obvious the use of "high purity" asbestos because suspensions of unit asbestos fibers produced by the Novak process contain a surface active agent and because the final product of the Novak process is in a minimal clotted state. These arguments, however, are not well taken since both of the differences referred to relate only to the Novak process and product and do not in any way detract from the teachings of the importance of using, in cellulose paper making, an asbestos in the unit fiber state, free of unopened fiber bundles, and free of foreign particles. In short, we think that one skilled in the art having used a "prior art" asbestos in the manufacture of, for example, white writing paper and having obtained a coarse, lumpy, black-speck-containing, gray product, would be led by the Novak teachings to use a cleaner, finer asbestos free of oversize particles and black-speck-causing materials. To us it appears that appellant has at best found that an asbestos of optimum cleanliness, fineness, and uniformity will give the expected results. We appreciate that production of such an asbestos on a commercial scale might be very difficult indeed; but that fact does not render non-obvious the use of that asbestos in paper making.[5]

Appellant's Rule 132 affidavit *at first glance* appears to show that use of appellant's "high purity" asbestos in the manufacture of paper gives results superior to those obtained using asbestos prepared according to the Novak process;[6] upon closer scrutiny, however, we find a number of serious defects which render this affidavit totally unpersuasive. The most serious of these defects, and the only one we need discuss, is that the asbestos compared with appellant's "high purity" asbestos was prepared in a manner *contrary* to Novak's teachings. Whereas Novak makes it abundantly clear that the amount of surface active agent used in his process should be just sufficient to result in the formation of an *unstable* colloidal dispersion of asbestos fibers which will revert to a "minimal clotted" state, appellant's affidavit expressly refers to the use of an amount of surface active agent sufficient "to obtain a *stable* dispersion." (Emphasis added.)[7] Furthermore, although Novak teaches that

Bits of unopened asbestos fiber that might be tolerated in * * * [asbestos paper], would be fatal to the expected uniformity of cellulose papers * * *

and that

During the evanescent colloidal periods it was possible to clean the fibers by screening, straining, centrifuging, etc., *to remove undesirable oversize or foreign particle material* content, and then allow the slurry to break [revert to the "minimal clotted" state] on further standing or mixing * * * [emphasis added]

appellant omitted this cleaning step. It is therefore no wonder to us that the paper produced from the Novak asbestos (*as prepared by appellant*) was coarse and ununiform and contained dark specks and asbestos fiber agglomerates.

The decision of the board is affirmed.

Affirmed.

5. Appellant has not contended that one skilled in the art would have difficulty producing such an asbestos at least on a laboratory scale.

6. Superior results, of course, are not necessarily unexpected.

7. Novak discloses that, if a suspension of "minimal clotted" asbestos fibers is diluted with water, there results a "smooth slurry of small, fluffy clots of fiber," whereas, if a colloidal dispersion of asbestos fibers is diluted with water, the fibers form "strings or clots of jellylike character." Such dilution occurs when the suspension or dispersion of asbestos fibers is added to aqueous suspensions of other paper-making ingredients.

WORLEY, C. J., took no part in the decision of this case.

SMITH, J., participated in the hearing of this case but died before a decision was reached.